ERIC HELTZER AND CAROL HELTZER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Heltzer v. Commissioner
Docket No. 24720-86
United States Tax Court
T.C. Memo 1991-404; 1991 Tax Ct. Memo LEXIS 437; 62 T.C.M. (CCH) 518; T.C.M. (RIA) 91404; August 19, 1991, Filed *437 Decision will be entered under Rule 155. Vincent J. Russo, Dennis J. Pappas, V. Roy Cacciatore, and Frederick J. Kramer, for the petitioners. William S. Garofalo, William F. Halley, and Barbara J. Fazekas, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION The primary issue in this case is whether petitioners may deduct claimed losses from London straddles transactions in 1980, 1981, and 1982, and from stripped U.S. Treasury notes in 1981. As discussed herein, we hold that they may not. Respondent determined the following deficiencies in petitioners' Federal income tax, additions to tax, and increased interest for taxable years 1980, 1981, and 1982: [SEE TABLE IN ORIGINAL] *438 After concessions, the issues for decision are: 1. Whether petitioner Eric Heltzer (petitioner) is a commodities dealer under section 108(b) of the Tax Reform Act of 1984, as amended, with regard to the transactions in issue. We hold that he is not. 2. Whether petitioner's trades had economic substance. We hold that they did not. 3. Whether petitioner's transactions were entered into primarily for profit. We hold that they were not. 4. Whether petitioner's EFP (an EFP transaction involves the simultaneous exchange of long positions in a cash commodity market (such as London) and a futures market (such as Comex)) transaction qualifies for tax-free treatment under section 1031. We hold that it does not. 5. Whether petitioners properly reported a short-term capital loss of $ 674,621.62 in 1981 from the alleged sale of the stripped corpus of U.S. Treasury notes. We hold that they did not. 6. Whether petitioner Carol Heltzer was an innocent spouse under section 6013(e) for 1980 and 1981. We hold that she was not. 7. Whether petitioners are liable for the additions to tax for negligence under section 6653(a) for 1980 and under section 6653(a) (1) and (2) for 1981. *439 We hold that they are. 8. Whether petitioners are liable for increased interest under section 6621(c) (formerly section 6621(d)) for underpayments attributable to tax-motivated transactions for the years 1980 and 1981. [1] We hold that they are. Respondent argued that, if we find that petitioners' transactions had economic substance and were engaged in for profit, petitioner Eric Heltzer improperly shifted the gains from his gold trading to the Comex position by utilizing artificial pricing. In light of our holdings discussed below, we need not decide this issue. All statutory references are to the Internal Revenue Code as in effect for the years in issue. Except where otherwise noted, all Rule references are to the Tax Court Rules of Practice and Procedure. Throughout this opinion, use of the terms "investor," "trade," "position," "execute," "gain," "loss," and the like, and references to the commodities and Treasury note transactions are not necessarily *440 intended as ultimate findings as to whether the transactions had economic substance or occurred in fact. FINDINGS OF FACT 1. Petitioners
Petitioners resided in Holmdel, New Jersey, when the petition was filed. When petitioners met, Carol Heltzer was in nursing school and petitioner was a truck driver. Carol Heltzer graduated from nursing school and worked for 4 years as a registered nurse. Petitioners were married in 1969, and purchased their home in Holmdel in 1977. At that time Carol Heltzer was employed as a nurse and petitioner worked for a costume jewelry importer. 2. Petitioners' Tax Returns and the Notice of Deficiency
Petitioners timely filed joint Federal income tax returns for the taxable years 1980, 1981, and 1982. a. 1980 Tax Return
On Schedule D of their 1980 return, petitioners reported a net short-term capital loss of $ 52,958.30, consisting of the following: [SEE TABLE IN ORIGINAL] Respondent disallowed the claimed loss from Primary (Lonconex, Ltd.). *441 b. 1981 Tax Return
On Schedule D of their 1981 return, petitioners reported the following: [SEE TABLE IN ORIGINAL] The reported short-term capital gain consists of the following: [SEE TABLE IN ORIGINAL] The reported short-term capital loss consists of the following: [SEE TABLE IN ORIGINAL] The reported long-term capital gains and losses are shown on the return as "regulated futures commodities - 60%." The $ 746,160 reported short-term capital gain from regulated futures commodities and the $ 1,119,240 reported long-term capital gain from regulated futures commodities total $ 1,865,400. Petitioners allocated this amount under the 40/60 provisions of section 1256. *442 Respondent disallowed the reported gain of $ 1,360,000 and loss of $ 2,113,400 from "Non-regulated-Foreign" transactions and also disallowed the reported "Treasury Bonds Trade" loss of $ 674,621.62 for 1981. The adjustment to capital gains and losses was $ 1,314,604.71, computed as follows: [SEE TABLE IN ORIGINAL] c. Tax Return Treatment of the London Silver and Base Metal Straddles The $ 1,753,550.50 loss in 1980 and the $ 1,360,000 gain in 1981 relate to the London silver straddle and the London base metal transactions at issue in this case, as follows: [SEE TABLE IN ORIGINAL] *443 Petitioners' net loss for 1980 and 1981 from the London silver and London base metal transactions was $ 393,550.50. The London silver and London base metal transactions are shown on the Lonconex, Ltd. documents in pounds sterling. During 1980, petitioners used a conversion rate of 2.455 to convert British pounds sterling to U.S. dollars. During 1981, petitioners used a conversion rate of 2.130. In computing the amounts shown on petitioners' returns, the accountant first computed the gains and losses in pounds sterling and applied the conversion factors to the bottom line. Lonconex provided the conversion rates used. The $ 2,113,400 loss disallowed by respondent and the $ 1,865,400 gain reported by petitioners in 1981 under the 40/60 provisions of section 1256 (and not disallowed by respondent) relate to the gold transactions at issue. d. Preparation of the Tax Returns
Petitioners' tax returns were prepared by George Sager (Sager), a C.P.A. in private practice for approximately 33 years. Petitioner provided Sager with certain tax return information on behalf of himself and his wife. Sager did not confer or meet with Carol Heltzer in reference to the preparation of the *444 tax returns. Another C.P.A., Leonard Rosen (Rosen), prepared work papers regarding petitioner's commodities trading. Rosen gave Sager documentation and information about certain commodity trades. Sager reviewed work sheets prepared and furnished by Rosen. Sager also relied on information about petitioners' Treasury bond transactions provided by Rosen's office. By check dated December 30, 1981, petitioners paid Rosen $ 25,000 for professional fees. They deducted this amount as "tax advice" on their 1981 return. 3. Petitioner's Commodities Background
Petitioner was a member of the Coffee, Sugar and Cocoa Exchange, Inc., in New York City beginning November 2, 1972, and continuing throughout the years in issue. This exchange is designated as a contract market by the Commodity Futures Trading Commission (CFTC). Petitioner actively engaged in trading section 1256 contracts on the Coffee, Sugar and Cocoa Exchange, and was a "commodities dealer" as defined in section 1402(i)(2)(B) during the years in issue. In 1976, the New York Coffee, Sugar and Cocoa Exchange merged with the Cotton Exchange, the Metal Exchange (Comex), and the Mercantile Exchange, currently known as the *445 Commodities Exchange Center (CEC). As a floor broker, petitioner executed orders for customers and for himself. Petitioner was located in the sugar pit daily. Between 1972 and 1980, petitioner traded coffee on the Coffee, Sugar and Cocoa Exchange as well as foreign currencies on the Mercantile Exchange. Petitioner also traded on Comex. By virtue of his membership on the Coffee, Sugar and Cocoa Exchange, he was permitted to be on the floor of the other exchanges and to place trading orders through brokers on the other rings. Carol Heltzer has never had an account with a commodities or stock broker, nor has she ever traded commodities or stocks or bonds of any type. 4. Lonconex, Ltd., and London Commodities Trading
During the years in issue, Lonconex, Ltd., was a London-based brokerage firm. It had no U.S. office or regular U.S. employees. Primary Industries Corporation and Primary Metal and Mineral Corporation (hereafter PM & M) were New York-based brokerage firms affiliated with Lonconex, Ltd. Primary Industries engaged in international metal trading in 1980, 1981, and 1982. PM & M was a subsidiary of, and shared office space with, Primary Industries. PM & M was *446 a futures commission merchant (FCM) during 1980, 1981, and 1982. Lonconex, Ltd., was a wholly owned subsidiary of Primary Industries (UK) Ltd. (a holding company), which was itself a wholly owned subsidiary of Primary Industries. Lonconex, Ltd., was a metal commodities broker. References to "Primary" are to the affiliated group of Primary Industries, PM & M, and Lonconex, Ltd. PM & M changed its name to Lonconex, Inc. (as opposed to Lonconex, Ltd.), in April 1982. Lonconex, Inc. was an FCM with membership privileges on Comex. During the years in issue David Threlkeld (Threlkeld) was the president of PM & M, but was not an officer of Primary Industries Corp. He was in charge of the trading of nonferrous metals, sugar, cocoa, coffee, oil, financial futures, and metals such as gold, silver, copper, tin, lead, and zinc. Murray Relis was a financial accountant and vice president of Primary Industries during 1980, 1981, and 1982. He was not an employee of Lonconex, Ltd., during those years. Lonconex, Ltd., was also a member of the London Metal Exchange (LME) and could issue LME contracts. Transactions on the London Market on behalf of the U.S. customers of Primary were conducted *447 through Lonconex, Ltd. The London organizations involved in this case are the LME for the base metals (i.e., nonferrous metals) trading and the London Gold Market and London Silver Market for the gold and silver trading. The LME and the London Gold Market and London Silver Market are principal to principal markets, meaning that the customer trades directly with the broker. In all of petitioner's transactions in the LME and London Metals Markets, Lonconex, Ltd., was the principal on the other side of each contract. Some LME contracts are traded on a "ring," but most are traded on the interdealer or telephone market. There is no requirement that the price in the telephone market be the same as on the ring. Prices in the telephone market are negotiated between the principals. The London Bullion Market consists of the London Gold Market and the London Silver Market. The London Gold Market had five members (the big five) and the London Silver Market had three members (the big three) during the years in issue. These members met daily to declare, i.e., fix prices. Lonconex, Ltd., was not a fixing member of either the London Gold or London Silver Markets. There is no ring in the *448 London Gold Market or London Silver Market. All trades are either done by the big five or big three in the fixing room or on the telephone market. U.S. markets are clearing houses where all positions are marked to market at the end of the day and margins are paid or received from the clearing house. London markets are forward markets where one trades for a forward delivery day, and gains and losses are payable or received on that delivery date. The LME and the London Bullion Market did not have a clearing house in 1980 and 1981. Lonconex, Ltd., was an associate member of the London Gold and London Silver Markets, and could trade in gold and silver under the rules of those markets. Lonconex, Ltd., could execute transactions subject to the rules of the London Gold and London Silver Markets without dealing with the big five or big three. There is no fixed margin requirement in the London markets. It is determined individually by each company. There is no standard contract or lot size on the London Gold and London Silver Markets. Prices, values, gains, and losses are stated in pounds sterling on the London Silver Market and in U.S. dollars on the London Gold Market. Lonconex, *449 Ltd., and other London brokers normally issue monthly statements of account to U.S. clients. However, no monthly statements were provided to petitioner by Lonconex, Ltd., for the trades in issue. Records of transactions executed or engaged in by Lonconex, Ltd., such as trade sheets, purchasing sales sheets, confirmation sheets, and difference account statements were prepared in London. Typically when a transaction was done, a mailgram was written from the trading ticket and sent to the customer. Contracts were then mailed from London directly to the customer, and the confirmations in the United States were mailed directly to the customer. Relis discovered the EFP confirmation from Lonconex, Ltd. and the Lonconex, Inc. files in the subbasement of Primary Industries and subsidiaries at 666 Fifth Avenue, New York, New York. These records were maintained in the normal course of business. 5. Petitioner's London Commodities Activities
On October 15, 1980, petitioner, through Leonard Rosen, opened a trading account with PM & M and executed a risk disclosure statement for the account. Petitioner was one of 30 individuals introduced by Rosen to PM & M and Lonconex, Ltd., whose *450 accounts were opened in similar fashion. Petitioner paid margin amounts by checks payable to Primary Industries on October 22, 1980, in the amount of $ 100,000, and on December 14, 1981, in the amount of $ 400,000. He paid no other amounts to Primary Industries, PM & M, or Lonconex, Ltd., during 1980, 1981, or 1982. Petitioner authorized Primary Industries and PM & M to trade commodities and contracts for his account by letter dated January 8, 1982. It confirmed that PM & M and Primary Industries had discretion to trade for petitioner from the date that he opened his account. He gave this written authorization to trade after the initiation of the Comex investigation. By letter dated December 1, 1981, petitioner granted Threlkeld permission to take the opposite side of any order given to him for execution by petitioner, unless specifically instructed to the contrary at the time of the order. Threlkeld never spoke to petitioner or any of Rosen's other clients. Rosen orally gave Threlkeld discretion to trade for petitioner's account. Threlkeld did not know if Rosen had written discretion authority from petitioner. Threlkeld has know Rosen since 1977 or 1978. Rosen requested *451 three opinions from the law firm of Cadwalader, Wickersham and Taft (Cadwalader) with regard to the tax treatment of the proposed gold transactions. The two opinions in evidence, dated November 17 and December 8, 1981, deal exclusively with tax aspects of the proposed transactions, involving commodity contracts in which Rosen's clients proposed to engage. Petitioner saw some tax opinions from the Cadwalader law firm. Petitioner received a $ 292,000 check from Primary Industries dated January 14, 1982. It was deposited in petitioner's personal bank account on January 18, 1982. The computation of the $ 292,000 received from Primary Industries is explained on petitioner's accountant's work papers as follows: [SEE TABLE IN ORIGINAL] The $ 400,000 margin amount was paid by the December 14, 1981, margin check. The RFC (regulated futures contracts) gain relates to the gain on the Comex gold transaction. The non-RFC loss relates to the loss on the London gold transactions. The interest income relates to interest paid or credited to petitioner by Lonconex, Ltd., which was reported by petitioner *452 on Schedule B of his 1981 return. The $ 292,000 received back from Primary Industries was computed with reference to the gold margin, gold transactions, and interest. Thus, petitioner paid $ 100,000 for his 1980 London silver transactions, which was his initial October 22, 1980, margin payment. No other amounts were paid, and there is no evidence that any of this amount was returned to petitioner. Petitioner's LME transactions consisted of purchases and sales of various metals contracts, including copper, lead, zinc, and aluminum contracts. On September 30, 1980, petitioner began engaging in transactions in London silver forward contracts. He opened a 300-lot London silver straddle by buying 150 lots of June 15, 1981, prompt date silver and selling 150 lots of May 15, 1981, silver valued at a total of # 28,200,000. On November 21, 1980, petitioner increased his balanced London silver positions to 350 lots by purchasing 25 lots of July 15, 1981, silver and selling 25 lots of June 15, 1981, silver (175 lots long and 175 lots short) resulting in total positions valued at # 32,615,000. On December 29, 1980, petitioner closed out 35 lots by selling 5 lots of July 15, 1981, silver *453 and 30 lots of June 15, 1981, silver at a loss of # 712,799.38. Petitioner also purchased 5 lots of June 30, 1981, silver and 30 lots of May 29, 1981, silver on December 29, 1980. As a result, petitioner was in a balanced position. As of December 31, 1980, petitioner was in a 350-lot balanced position in London silver valued at a total of # 31,888,500. On January 16, 1981, petitioner closed out all of his remaining London silver positions and realized a gain of # 4,869,862.49 and a loss of # 4,226,447.50 for a net gain of # 643,414.99 (after commissions). None of petitioner's silver straddles had a delivery month (prompt date) spread of over 1 month. Lonconex, Ltd., charged a commission for petitioner's London silver transactions equal to 1/16 of 1 percent of the value of most of the trades but charged no commission on other trades. The total commissions on the London silver transactions equaled # 20,384.39 or approximately 1/30 of 1 percent of the total value of all trades. The total value of all trades was # 60,526,000. Lonconex charged a commission of 1/8 of 1 percent on each leg of petitioner's London base metal transactions. However, with regard to the lead transactions, *454 difference account 53018 had a commission of 1/16 of 1 percent on each leg and difference account 62402 had no commission. No margin was required for petitioner's London silver transactions beyond the initial payment of $ 100,000. Petitioner did not pay any further amount to Lonconex, PM & M, or Primary Industries to settle these London silver and base metal transactions. Petitioner's actual out-of-pocket loss on the silver transactions was limited to his $ 100,000 margin payment. 6. Execution of the Trades at Issue
a. Establishment of Spread Positions
Between December 10 and December 18, 1981, Primary established spread positions in London forward contracts on the London Gold Market for the 31 customers (including petitioner). Twelve customers went short (sold) 10,976 contracts of February 26, 1982, gold and long (bought) 10,976 contracts of April 1, 1982, gold. Nineteen customers (including petitioner) went long (bought) 11,420 contracts of February 26, 1982, gold and short (sold) 11,420 contracts of April 1, 1982, gold. Lonconex, Ltd., as a principal, took the opposite side of each of these spread positions. Petitioner was long 2,000 contracts of February *455 26, 1982, London gold and short 2,000 contracts of April 1, 1982, London gold, worth a total of approximately $ 170,000,000. As a result, the short sides of the London spread positions of the 31 customers (including petitioner) had an unrealized profit and the long sides had an unrealized loss. The London gold positions held by the 31 customers just before the December 21, 1981, transactions totaled 44,792 contracts, or lots at 100 ounces per contract, for a total of 4,479,200 ounces. At a price of $ 411 per ounce the transactions had a total dollar volume of $ 1,840,951,200. The December 1981 gold straddles established for the 31 customers (including petitioner) had a spread from February 26 to April 1, or 34 days. b. The December 21, 1981, Cross-trades
On December 21, 1981, the long legs of the spreads for the 31 customers (including petitioner) and the short legs of Lonconex, Ltd.'s spreads were liquidated in the London Gold Market. Petitioner closed out his long February 26, 1982, leg at $ 412.80 per ounce and recognized a $ 2,113,400 loss. The customers all realized losses on the close out of their long legs. On December 21, 1981, at about 12:05 p.m., Threlkeld entered *456 an order on Comex with floor broker Anthony Steo (Steo) to buy 11,420 Comex April 1, 1982, gold contracts for the 19 customers (including petitioner) who were short April 1, 1982, London gold and to sell 11,420 April 1, 1982, gold contracts for the account of Lonconex, Ltd. Steo executed the entire order by means of 10 cross-trades in lots ranging from 400 to 3,000 over a period of about 33 minutes. [2] Twenty contracts were bought by another broker; however, Steo placed this sale into his firm's error account and later bought these back to offset the positions. The next largest trade of April gold that day by any other broker was 60 contracts. At about 12:35 p.m., Primary entered an order on Comex with Mark Levine of Telic Trading Corp., to buy 10,976 Comex February gold contracts for the 12 customers who were short February 26, 1982, London *457 gold and sell 10,976 Comex February gold for the account of Lonconex, Ltd. Levine gave the order to his employee, floor broker Rosenthal, to execute. Rosenthal executed the February gold orders in six cross-trades over 17 minutes in lots of 500 to 5,000 contracts (10,963 contracts total). Thirteen of the lots were traded opposite another broker. The cross-trades for petitioner involved the purchase of 1,020 contracts of April gold at $ 416 per ounce and 980 contracts of April gold at $ 416.80 per ounce. These purchases took place at 12:47:23 p.m. and 1:03:21 p.m. Upon completion of these transactions, 19 customers were short April 1, 1982, London gold and long April Comex gold, and 12 customers were short February 26, 1982, London gold and long February Comex gold. Lonconex, Ltd., was long in the London market and short on Comex for corresponding amounts. These trades were part of a series of preplanned transactions by which the customers' long London legs and Lonconex, Ltd.'s short London legs were liquidated at the same time the customers' long Comex positions and Lonconex, Ltd.'s short Comex positions were established. c. The December 21, 1981, EFP's
At 1:08 p.m. *458 on December 21, 1981, Primary gave an order to Steo to close out the April London and Comex gold positions of the 19 customers and of Lonconex, Ltd., by means of Exchange For Physical (EFP) transactions. Primary then gave Levine an order to close out the February London and Comex positions of the 12 customers and of Lonconex, Ltd., by means of EFP transactions. Levine gave the order to Rosenthal to execute. Rosenthal did not know who Primary's customers were, and simply executed the trade pursuant to the terms of the order. An EFP transaction involves the simultaneous exchange of long positions in a cash commodity market (such as London) and a futures market (such as Comex). The futures market transaction is a noncompetitive transfer of a futures position between the parties to the EFP. In an EFP, one party buys the physical commodity or forward contract for such commodity and simultaneously sells or gives up a long futures contract while the other party sells the physical or forward contract and simultaneously buys or receives a long futures contract. Trades exited by an arbitrage or an EFP do not necessarily demonstrate prearranged trading. In an EFP, the prices are not *459 always at market. Prices in an EFP are negotiated between the parties. In this case, the EFP transaction involved the exchange by the customers, including petitioner, of their long Comex positions (established by cross-trade a few minutes earlier) for long London positions held by Lonconex, Ltd. This closed out the customers' Comex positions and also closed out their London positions by offset. Between 1:10:13 p.m. and 1:11:00 p.m. (47 seconds), Steo executed the EFP of all 11,420 Comex and 11,420 London positions in April gold. Between 1:13:39 p.m. and 1:13:56 p.m. (18 seconds), Rosenthal executed the EFP of all 10,976 Comex and 10,976 London positions in February gold. The remaining London and Comex positions of the 31 customers and Lonconex, Ltd., were liquidated by means of these EFP transactions. Petitioner's Comex long positions (established by the Steo cross-trades) were closed out by the EFP transaction shortly thereafter. The Comex Daily Market report for December 21, 1981, shows that 11,422 April gold EFP's were executed that day, meaning that all but two were executed by Primary. Of the 11,913 February EFP's executed that day, all but 937 were done by Primary. *460 Primary's 31 customers (including petitioner) and Lonconex, Ltd., traded 44,792 Comex contracts (22,396 on cross-trade and 22,396 on EFP) on December 21, 1981. This was almost half of the estimated 90,000 contract volume of all Comex gold contracts traded that day. The April Comex gold contracts traded by Primary (11,420 contracts) compare to 1,506 April gold contracts traded the previous trading day on Comex. d. Pricing the Transactions
Primary, in the person of Threlkeld, set the price for both the customers and for Lonconex, Ltd. (the house). In executing the EFP transactions, Rosenthal and Steo took the price given to them by Primary. At the time of the EFP transaction, the Comex market price for April gold was between $ 416.30 and $ 416.50 per ounce or approximately $ 416.40 per ounce. The market price for London April 1, 1982, gold at that time was around $ 416 or $ 417 per ounce. The price for the EFP "sale" by petitioner of Comex April gold was fixed by Threlkeld at $ 426 per ounce. The price for the EFP "purchase" by petitioner of London April gold (which closed out his short London gold position) was set by Threlkeld at $ 422.60 per ounce for 1,000 contracts *461 and $ 431.30 per ounce for 1,000 contracts. These were the same prices at which the short London positions were established on December 10, 1981, and December 18, 1981. The EFP prices were intentionally set by Threlkeld at the original price of the short London positions so that no gain or loss would result. This way, the gain would be realized in the United States (on the Comex positions) rather than in London. If the EFP had been done at the market price there would have been a large gain realized in London. With respect to petitioner's transactions, as the EFP price rose above the market price, more of the gain was shifted to the Comex positions and less was realized in London. No commissions were charged to petitioner by Lonconex, Ltd., or Primary with regard to the London gold transactions. Petitioner paid a lump-sum commission of $ 53,000 on the Comex transactions. The trades were indirectly offset for the customers so as to make the house flat, i.e., to avoid risk of loss to the house, to avoid a lack of market liquidity, to make commissions, and to offset as much market exposure as possible to the customers. 7. The Comex Investigation
A Comex investigation *462 of these London/Comex transactions began on December 21, 1981, the day that the cross-trades and EFP transactions occurred. Comex is required by the Commodities Exchange Act to have a Compliance Department. The investigation was conducted by the vice president and other staff of the Compliance Department. The Comex investigation was conducted to determine if these trades violated Comex exchange rules. During the investigation, the Compliance Department requested records from PM & M and Lonconex, Ltd., obtained broker trading cards from Anthony Steo (Steo) and Mark Rosenthal (Rosenthal), took depositions of Steo and Rosenthal, took depositions of Threlkeld, and obtained records from the exchange. During the investigation, the compliance staff prepared reports dated May 21, July 20, and December 6, 1982, to the Supervisory Committee of Comex, the board of governors of Comex, and the Committee on Business Conduct of Comex, respectively. The Compliance Department made recommendations to the Committee on Business Conduct which issued complaints against PM & M and Lonconex, Ltd. The Compliance Department obtained various records from PM & M. Lonconex, Ltd., refused to produce any *463 documents until 2 days before the hearing on June 16, 1983. At the hearing, PM & M and Lonconex, Ltd., were represented by counsel. Petitioners did not participate in the hearing and were not represented by counsel during this or later stages of the Comex disciplinary action. The Supervisory Committee rendered its decision on August 16, 1983, and assessed a fine of $ 130,000 jointly and severally against PM & M and Lonconex, Ltd. PM & M and Lonconex, Ltd., appealed to the Comex board of governors, which issued its decision on November 4, 1983, raising the fine to $ 200,000. PM & M and Lonconex, Ltd., requested review by the CFTC of the Comex disciplinary action. By memorandum report dated October 12, 1984, the CFTC Division of Trading and Markets recommended to the Commission that the application for review be denied. The Commission concurred in the denial of review. 8. Petitioner's Treasury Notes Transactions
Petitioner paid $ 50,000 and $ 15,000 to Lombard-Wall Services, Inc. (Lombard-Wall), by checks dated December 15, 1981, and December 18, 1981, respectively. On December 16, 1981, petitioner purchased from Lombard-Wall $ 1,000,000 face amount of U.S. Treasury *464 notes bearing 16-1/8-percent interest coupons and due November 15, 1986. The notes were purchased at a price of $ 109 3/32 (per $ 100 face amount) for a total purchase price of $ 1,091,875 plus $ 43,604.90 for accrued interest. On December 18, 1981, petitioner purchased from Lombard-Wall $ 300,000 face amount of U.S. Treasury notes bearing 16 1/8-percent interest coupons and due November 15, 1986. These notes were purchased at a price of $ 108 6/32 for a total purchase price of $ 324,562.50 plus $ 13,348.73 for accrued interest. On December 31, 1981, petitioner stripped the coupons and sold $ 1,105,000 face value of stripped corpus to Lombard-Wall for a total price of $ 529,350.25. Petitioner sold the stripped coupons attributable to the $ 1,105,000 face notes to Lombard-Wall on January 11, 1982, for a total price of $ 689,113.30, and reported this amount as interest income on the 1982 return. On January 11, 1982, petitioner sold $ 195,000 face amount of notes (with coupons attached) to Lombard-Wall, for a total purchase price of $ 215,023.85. Petitioner did not speak to anyone at Lombard-Wall. Instead, he instructed Rosen to purchase the notes and strip the coupons. Petitioner *465 had no firsthand knowledge of the Treasury note transactions other than the documents received from Lombard-Wall. The basis for the notes (with coupons attached) was $ 1,416,437.50 ($ 1,091,875 plus $ 324,562.50), plus additional basis of $ 56,953.63 ($ 43,604.90 plus $ 13,348.73) paid for accrued interest. Petitioner computed the basis for the January 11, 1982, sale of $ 195,000 face amount of notes (with coupons attached) as follows: [SEE TABLE IN ORIGINAL] The remaining basis available for allocation to the $ 1,105,000 face amount of notes (corpus and coupons) was $ 1,203,971.80, computed as follows: $ 1,105,000 / $ 1,300,000 X $ 1,416,437.50 = $ 1,203,971.80 Petitioner allocated the entire $ 1,203,971.80 basis to the stripped corpus and none to the coupons. Petitioners reported a short-term capital loss of $ 674,621.62 on their 1981 return from the purported sale of $ 1,105,000 face amount of Treasury notes (ex-coupon). This loss was computed as follows: [SEE TABLE IN ORIGINAL] *466 Petitioners reported a short-term capital loss of $ 54,395.41 on their 1982 return from the purported sale of $ 195,000 face amount of Treasury notes with coupons attached. This loss was computed as follows: [SEE TABLE IN ORIGINAL] Lombard-Wall filed for bankruptcy in August 1982. 9. Petitioner Carol Heltzer
At the time of their marriage, petitioner did not have substantial savings, and Carol Heltzer had savings of only about $ 1,000 to $ 2,000. Carol Heltzer left nursing when she had children. From 1980 to 1982 she was primarily a homemaker. Around 1980 she obtained a real estate sales license, and during 1980 and 1981 she worked part time as a real estate sales person. Carol made only one sale as a realtor. She reported small amounts of real estate sales commission income in 1980 ($ 2,640) and 1981 ($ 932.50). During the years in issue petitioners maintained a joint checking account and both had signatory authority over it. During the years in issue Carol Heltzer received a weekly cash allowance from petitioner of $ 500 per week in 1980 and $ 600 per week in 1981 and 1982. This allowance totaled $ 26,690 *467 for 1980, $ 30,800 for 1981, and $ 29,950 for 1982. Carol Heltzer also had charge accounts at department stores. Carol Heltzer wrote checks on the joint checking account totaling $ 28,985.67 for 1980, $ 22,069.12 for 1981, and $ 13,968.49 for 1982, which amounts do not include the weekly cash allowance checks. During these years, Carol Heltzer executed less than 6 percent of the checks. During the years in issue petitioners sporadically employed two live-in housekeepers and a housekeeper who did day work for them. Petitioners had a family membership at the Middletown Swim and Tennis Club. Carol Heltzer was also a member of the Holmdel Tennis Center during some of this time. During the years in issue petitioners had a swimming pool and a patio constructed on their property. Petitioners also had the pool area landscaped and enclosed by a fence. The entire pool package cost approximately $ 77,000. Before 1980, petitioners had made only minor improvements to their home. During the years in issue petitioners finished their basement, installed a burglar alarm and new carpeting, purchased art for their home for $ 2,625, and employed an interior decorator for $ 10,667.78. During *468 1980 to 1982, petitioners also purchased $ 5,000 worth of jewelry for Carol Heltzer and a fur coat. In 1982 petitioners purchased a new Volkswagen convertible. During the years in issue petitioners vacationed in Florida or the Caribbean four to six times each year. Petitioners also took a trip to London and Carol Heltzer vacationed with friends in Greece during those years. Petitioner has not worked since 1985. Since 1982 petitioners have also put a new roof on the house, waterproofed the basement, fixed a retaining wall on the property, renovated their kitchen, and installed new air-conditioning and heating equipment. Petitioner's earnings from commodity trading were used to purchase certificates of deposit during 1980, 1981, and 1982. The certificates of deposit increased in value from $ 740,000 in the beginning of 1980 to $ 2,150,000 by the end of 1981. The interest on the certificates of deposit was deposited into petitioners' joint checking account. During 1985 petitioner redeemed $ 3.9 million in Treasury bills and the proceeds were deposited into petitioners' joint account. During 1986 petitioner redeemed $ 2.3 million in Treasury bills and deposited the proceeds *469 into petitioners' joint account. Petitioners each signed the joint income tax returns for the years 1980, 1981, and 1982. OPINION 1. Application of the Per Se Dealer Rule to Petitioner
Petitioner argues that he qualifies for the per se dealer rules under section 108(b)[3] of the Deficit Reduction Act of 1984, as amended by section 1808(d) of the Tax Reform Act of 1986. Respondent argues that the per se rule of section 108(b) is unavailable to petitioner with respect to the London silver and base metal transactions because they were prearranged and were transacted on the London market in such a manner as would have violated the rules of domestic exchanges. We will decide whether he is eligible as to (a) the London silver and base metal transactions, or (b) the London and Comex *470 gold transactions. Petitioner bears the burden of proof. Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). a. Background
In 1984, Congress enacted section 108 of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630, which applies to dispositions of commodity straddle positions entered into before 1982 and to which the amendments made by title V of the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, 95 Stat. 172, 325, do not apply. Section 108(a) generally permitted the deductibility of losses incurred on the disposition of one or more positions entered into before 1982 and which form part of a straddle, if the position was part of a transaction entered into for profit. Section 108(b) applied to commodities dealers and persons regularly engaged in investing in regulated futures contracts, and created a rebuttable presumption that the transaction was entered into for profit. Section 108 was amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2817-2818. As amended, section 108(a) provides that, in the case of any disposition of one or more positions entered into before 1982 and which *471 form part of a straddle, any loss from such disposition is allowed for the taxable year of the disposition if the loss is incurred in a trade or business or in a transaction entered into for profit. Section 108(b), as amended, eliminated the rebuttable presumption for commodities dealers and substituted a per se rule that any loss incurred by a commodities dealer in the trading of commodities is treated as a loss incurred in a trade or business. Section 108(f), as amended, defines a "commodities dealer" as an individual described in section 1402(i)(2)(B). Under section 1402(i)(2)(B), a commodities dealer is any person who is (a) actively engaged in trading section 1256 contracts, and (b) registered with a domestic board of trade designated as a contract market by the Commodities Futures Trading Commission. The parties agree that petitioner was a commodities dealer during the years in issue. Section 108(b) does not apply to transactions which are not bona fide. DeMartino v. Commissioner, 862 F.2d 400, 404-407 (2d Cir. 1988), affg. T.C. Memo 1986-263; Katz v. Commissioner, 90 T.C. 1130, 1137 (1988); Cook v. Commissioner, 90 T.C. 975, 982-984 (1988), *472 affd. F.2d (9th Cir. Aug. 12, 1991). Similarly, section 108(b) does not apply to dealers whose transactions were fictitious, prearranged, or performed in a manner that violated or would have violated the rules of a domestic exchange. Cook v. Commissioner, supra at 985-986. The Court in Cook described the contracts in Glass v. Commissioner, 87 T.C. 1087 (1986) (Court reviewed), affd. sub nom. Lee v. Commissioner, 897 F.2d 915 (8th Cir. 1989), affd. sub nom. Kielmar v. Commissioner, 884 F.2d 959 (7th Cir. 1989), affd. sub nom. Dewees v. Commissioner, 870 F.2d 21 (1st Cir. 1989), affd. sub nom. Friedman v. Commissioner, 869 F.2d 785 (4th Cir. 1989), affd. sub nom. Keane v. Commissioner, 865 F.2d 1088 (9th Cir. 1989), affd. sub nom. Ratliff v. Commissioner, 865 F.2d 97 (6th Cir. 1989), affd. sub nom. Killingsworth v. Commissioner, 864 F.2d 1214 (5th Cir. 1989), affd. sub nom. Kirchman v. Commissioner, 862 F.2d 1486 (11th Cir. 1989), affd. sub nom. Yosha v. Commissioner, 861 F.2d 494 (7th Cir. 1988), *473 affd. sub nom. Herrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988), as follows: the contracts in Glass were tailor-made between broker/dealer and taxpayer, not transacted through "open outcry" on the LME ring, and as the facts in Glass amply bear out, were deliberately prearranged. [Emphasis in original.]
Cook v. Commissioner, supra at 986. The legislative history of section 108 provides that the per se rule of section 108(b) "would not be available in any cases where the trades were fictitious, prearranged, or otherwise in violation of the rules of the exchange in which the dealer is a member." H. Rept. No. 99-426, at 911, 1986-3 C.B. (Vol. 2) 911. Section 108(b) applies only "for purposes of subsection (a)." Section 108(a) does not apply to sham transactions. DeMartino v. Commissioner, supra at 407; Cook v. Commissioner, supra at 986, n.6. See also Perlin v. Commissioner, 86 T.C. 388, 419 (1986). If a transaction is a sham, no real loss is incurred with respect to which section 108(b) can apply. Cook v. Commissioner, supra at 985-986. *474 Similarly, in Lerman v. Commissioner,939 F.2d 44 (3d Cir. 1991), affg. Fox v. Commissioner, T.C. Memo 1988-570, the Third Circuit (the Court to which an appeal would lie in this case before us) held that option-straddle transactions devoid of economic substance cannot be the basis for deductions under section 108 since transactions lacking in economic substance cannot result in an actual loss. In Lerman, as in Cook v. Commissioner, supra, the taxpayers were commodities dealers who argued that they were entitled, as a matter of law, to the deduction for losses under the per se rule of section 108(b). In rejecting this argument, the Court emphasized that sham transactions are outside the purview of section 108, and that section 108(b) was not intended to obviate the requirement that transactions have economic substance to be eligible for loss deduction status. b. The London Silver and Base Metal Transactions
Respondent contends, and petitioners deny, that the London silver and base metal transactions are factual shams. The parties agree that LME has engaged in legitimate commodities transactions on behalf of customers, *475 and they also agree that LME has been a party to factual shams patterned after legitimate transactions, such as those described in Forseth v. Commissioner, 85 T.C. 127 (1985), affd. 845 F.2d 746 (7th Cir. 1988), affd. per curiam sub nom. Enrici v Commissioner, 813 F.2d 293 (9th Cir. 1987), affd. without opinion sub nom. Bramblett v. Commissioner, 810 F.2d 197 (5th Cir. 1987), affd. sub nom. Mahoney v Commissioner, 808 F.2d 1219 (6th Cir. 1987), affd. without opinion sub nom. Wooldridge v. Commissioner, 800 F.2d 266 (11th Cir. 1986). LME inspired, designed, and executed gold and platinum straddles that we have previously found to be factual shams. Forseth v. Commissioner, supra; Thurner v. Commissioner, T.C. Memo 1990-529. As set forth below, we conclude that the transactions at issue in this case lack economic substance, and therefore the per se rule of section 108(b) does not apply. c. The London Gold Transactions and the December 31, 1981, Comex Transactions The London gold and Comex gold straddles at issue here are *476 straddles to which the ERTA amendments apply since they were established after June 23, 1981 (the effective date of ERTA). Since section 108 does not apply to straddles to which the ERTA amendments apply, the per se rule of section 108(b) does not apply to these transactions. 2. Witness Testimony
Rosenthal testified that these cross-trade and EFP orders were the largest he had ever executed on the commodity exchange. Petitioner's expert, Dennis Selby (Selby), stated that petitioner's gold transactions were "quite large." Selby indicated that petitioner probably would have been required to post margin in order to trade, and that $ 500,000 was probably the minimum amount that would have been appropriate. Selby testified that he noticed nothing odd about the base metal transactions. Selby concluded, based on the documents concerning petitioner's trades, that petitioner's transactions had a basis in reality and actually took place. Selby admitted, however, that it would be improper for a broker having discretion over two accounts to have one customer go short and a second customer go long in equal positions in the same market. He indicated that such offsetting was an indication *477 of tax motivation and not profit motivation. Threlkeld admitted that Primary would have been in trouble if another broker had picked up a substantial number of contracts on the Comex trades (the cross-trades). 3. Economic Substance of Petitioner's London Commodities Activities Petitioner argues that his London commodities activities had economic substance and significant nontax consequences. Specifically, petitioner contends that there was market risk and potential financial reward, that the commissions were built into the traded net prices in the London Bullion Market, and that he maintained sufficient margin. Respondent's position is that petitioner's commodity straddles lacked economic substance as evidenced by the lack of sufficient margin, risk, and commission. A transaction is not recognized for Federal income tax purposes if: (1) It is fictitious or a sham, Falsetti v. Commissioner, 85 T.C. 332, 347 (1985); or (2) the transaction lacks economic substance, Frank Lyon Co. v. United States, 435 U.S. 561, 573, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978); Knetsch v. United States, 364 U.S. 361, 366, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960). The substance of the transaction, not its *478 form, determines its tax consequences. James v. Commissioner, 87 T.C. 905, 918 (1986), affd. 899 F.2d 905 (10th Cir. 1990). We have previously decided cases in which we held that tax-motivated commodity straddle trading on the London markets lacked economic substance. Glass v. Commissioner, supra; Forseth v. Commissioner, supra; Thurner v. Commissioner, supra; Marcus v. Commissioner, T.C. Memo 1988-3. Commodity trading lacks economic substance where it is virtually risk-free or prearranged in order to generate tax losses and not for genuine economic gain. See Katz v. Commissioner, supra at 1138-1140. The presence or absence of risk or profit potential is relevant to whether economic substance exists. Freytag v. Commissioner, 89 T.C. 849, 877-878 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. U.S. (June 27, 1991); Glass v. Commissioner, supra at 1174-1175. Petitioners have documents showing that transactions occurred. However, as discussed below, a number of *479 objective factors indicate that these transactions were prearranged, lacked substantial risk, and thus were not bona fide. These factors are: the lack of business formalities, the lack of proper margin, the failure to pay losses allegedly incurred, the offsetting of investor positions, Primary's conflict of interest, the emphasis on taxes in promotional materials and petitioner's investigation, the use of trading patterns solely motivated by tax purposes, the correlation of tax losses to needs, the use of artificial pricing, the volume of trading, and the use of variable commissions. a. Lack of Business Formalities
In December 1980, petitioner's outstanding position in London silver consisted of straddles worth a total of approximately # 33 million. In December 1981, his outstanding position in London gold consisted of straddles worth approximately $ 170,000,000. The lack of formalities surrounding these vast transactions is noteworthy. Petitioner's trading began September 30, 1980, with the establishment of a 300-lot silver straddle valued at roughly 28 million pounds sterling. This was several weeks before the account was opened on October 15, or any margin deposit, *480 standard risk disclosure statement, or other agreement was provided. Petitioner's trading, worth nearly $ 70,000,000, took place when there was no open account and nothing in writing between Primary and petitioner. Petitioner had no direct dealings with Primary in opening the account; it was done by Rosen. Rosen orally gave Threlkeld trading discretion, although he had no written authority from petitioner. Written authorization was obtained in January 1982, after the Comex investigation was underway and Threlkeld was informed that oral discretion was insufficient. Threlkeld and Lonconex apparently were willing to take Rosen's word that petitioner was willing to give him trading discretion and to pay for any trading losses, and was good for any such losses, to the extent that margin was not required. Lonconex sold petitioner a position of $ 70,000,000 based on that word. Given that Threlkeld had known Rosen, an American accountant, only since 1977 or 1978, this trust is extraordinary. No monthly statements were given to petitioner for the London transactions, although Lonconex and other brokers generally gave such statements to their investors. The lack of proper business formalities *481 indicates that there was little or no economic risk. See Mahoney v. Commissioner, 808 F.2d 1219, 1220 (6th Cir. 1987), affg. Forseth v. Commissioner, 85 T.C. 127 (1985); Freytag v. Commissioner, supra at 882. b. Lack of Proper Margin
Petitioner lacked adequate margins at various times in his trading. Inadequate margins indicate lack of economic substance. Forseth v. Commissioner, supra at 154-157. The margin amounts paid by petitioner were not in line with standard practice, bore no relationship to standard commissions, and were paid long after petitioner's trading began. Petitioner's 1980 silver trading (worth # 28,200,000) began several weeks before Lonconex deposited petitioner's first margin check for $ 100,000 on October 24, 1980. Similarly, petitioner's December 1981 gold trading began on December 10, 1981, 6 days before the deposit by Primary of petitioner's $ 400,000 margin check dated December 14, 1981. Petitioner argues that he maintained sufficient margin throughout his trading, and that his December 1981 gold trading before the deposit of his $ 400,000 margin check reflects *482 standard business practice of allowing qualified clients to trade prior to margin deposits. Petitioner further argues that the fact that margin checks were issued on two separate occasions is evidence that petitioner provided margin when required. We are not convinced that trading at these levels without margin payments is standard practice. Petitioner's trading of large quantities of silver and gold before the deposit of margin and (for the silver) before the opening of his account suggests the trades had no economic substance. A trade that is made without prior margins suggests that the trade did not occur. c. Failure to Pay Losses Allegedly Incurred
Although petitioner's 1980 and 1981 silver and base metal trading generated paper losses far in excess of petitioner's margin, he never paid off such losses. The failure to require payment of losses in excess of margin is evidence that the trades lacked economic substance. Freytag v. Commissioner, supra at 879-880; Forseth v. Commissioner, supra at 160-161. Petitioner claimed $ 1,753,550.50 in losses from silver and base metal trading in 1980, and $ 1,360,000 in gains from *483 these commodities in 1981. The net silver and base metal loss for 1980 and 1981 was $ 393,550.50. Petitioner's only margin payment for the silver trades was $ 100,000, on October 16, 1980. No margin call or payment was ever made for the balance of the $ 293,550.50 loss. The remaining balance was not covered by either petitioner's subsequent $ 400,000 margin payment to Primary or the $ 140,000 interest income from the silver trades because both amounts were used to offset the $ 248,000 net loss from gold trading, with the remainder refunded. Notwithstanding petitioner's claim that if petitioner "had actually incurred trading losses to the point where funds were required, Primary/Lonconex would have demanded" them, petitioner's failure to pay account deficits indicates that the trading lacked economic substance. d. The Offsetting of Investor Positions
Petitioner argues that Primary was attempting to make a profit for petitioners, and for itself and its other clients. Petitioner maintains that Primary offset some but not all of its client trades, resulting in a net position for Primary. If Primary gained or lost with some individuals, it would lose or gain an unequal offsetting *484 amount with its other clients. Petitioner argues that in the long run, both sides would have profit opportunities as would Primary. Finally, petitioner maintains that Primary's clients did not cancel each other out because one individual's position had no effect on another's. Thus, petitioner's account was not affected by the results of Primary's trading on account of other clients because his account was never blended with another client's or Primary's equity. Primary avoided risk of loss by offsetting the investor trades. This was done by having the investors take opposing positions, i.e., if half of the investor trades were long February gold, the other half would be short February gold. Thus, Primary had no net position, while the investors were split into two opposing groups. The clearest example of offsetting involves the December 1981 London and Comex gold positions. The 31 investors were split into 2 groups, one with 12 individuals and the other with 19 (including petitioner). These groups took the following aggregate positions in London gold (with Lonconex, Ltd., on the opposite side of each): [SEE TABLE IN ORIGINAL] *485 Thus, the investors virtually canceled each other out. Of the 44,792 contracts, only 888 (less than 2 percent) did not offset another investor. Based on Primary's trading strategy on behalf of petitioner and the other investors, it appears that Primary's main focus was not to seek profits for the investors. The experts for both parties agreed that Primary's offsetting strategy was improper and unethical. They also admitted that such offsetting was an indication that profits were not being sought for the investors. e. The Emphasis on Taxes in the Promotional Materials and Petitioner's Investigation Respondent maintains that the information sought and obtained by petitioner prior to entering the commodity trades in issue focused upon potential tax benefits. Petitioner argues that he was motivated by possible profits and not tax avoidance or tax benefits. Petitioner notes that while he did not request the Cadwalader tax opinions, the fact that he reviewed them indicates that tax consequences were a legitimate concern as they would be for any prudent investor. Petitioner also notes that there were no promotional materials for the commodity trades. Finally, petitioner argues *486 that his failure to investigate the profit record of Primary and Lonconex was due to their stature and fine reputation in the trading community. We are not convinced that petitioner gave trading discretion to Lonconex because of its trading or profit-making expertise. Apparently there were no promotional materials other than the Cadwalader tax opinions. Petitioner offered no evidence that he conducted an investigation into the track record of Primary in making profits for its customers on metals trading. Petitioner had no contact with Threlkeld. Instead, he used Rosen, his accountant, as his go-between. If profit or hedging, rather than tax benefits, was petitioner's primary interest in the transactions, it seems unlikely that he would have relied on an accountant who had far less trading experience than himself. Indeed, the $ 25,000 fee paid to Rosen is characterized on petitioners' tax return as being for tax advice rather than investment advice. Whether petitioner investigated Primary and the content of any promotional materials are factors in deciding whether the trades had economic substance or were engaged in for profit. Ewing v. Commissioner, 91 T.C. 396, 418-419 (1988); *487 see also Rose v. Commissioner, 88 T.C. 386, 412 (1987) (Court reviewed), affd. 868 F.2d 851 (6th Cir. 1989). f. The Tax-motivated Trading Patterns
Respondent argues that petitioner's trading patterns in gold and silver are further evidence of lack of economic substance or profit motive. Petitioner maintains that all trading has tax consequences, and contends that his gold and silver trading indicates profit motive and fits the patterns of tax consequences trading with bona fide economic justification. In Ewing v. Commissioner, supra at 419, the Court found four factors indicating tax-motivated as opposed to for-profit trading. These factors were: (1) The maintenance of spread positions in thin markets which had low volume trading, (2) a small temporal difference in the delivery months, (3) the closing or canceling of the loss leg prior to yearend to generate losses, and (4) special activity with respect to the gain leg to generate long-term gains. All of these factors are present in this case. None of the silver straddles purchased by petitioner in 1980 had a delivery month spread of over 1 month. The December *488 1981 gold straddles had a 34-day spread from February 26 to April 1. The delivery date spreads in Ewing were generally 1 to 3 months. 91 T.C. at 409-410, 412, 425-432. Petitioner only closed out loss positions for the silver straddles in 1980, thus deferring the gains to 1981. In contrast, petitioner closed out the loss leg of the 1981 gold straddles in London (to generate short-term capital loss) and closed out the gain leg on Comex via an EFP (to generate 60 percent long-term capital gain). The EFP shifted the gold gain to the United States, where it would receive favorable tax treatment. Sec. 1256(a). Thus, petitioner's trading had both the loss leg close-out and special activity resulting in generation of long-term capital gain found in Ewing. See also Glass v. Commissioner, 87 T.C. at 1087 (intentional realization of losses in year one and movement of offsetting capital gain to subsequent year to obtain tax deferral evidences lack of profit potential and economic substance). With regard to trading in relatively thin markets, see discussion of the volume of trading below. Petitioner's trading occurred primarily at yearend, *489 another indication of tax-motivated trading. For example, petitioner's silver trading began September 30, 3 months before the end of the year, and was completed January 16, shortly into the new year. The switch in positions that generated the loss occurred December 29. Also, petitioner's gold trading began and concluded in December 1981. g. The Correlation of Tax Losses to Tax Needs
Respondent contends that in 1980 and 1981, petitioners' gains and losses from their commodity and Treasury note trading correlated closely to their tax requirements. Petitioner argues that the correlation of trading losses to his tax needs is insufficient to suggest predictability, and that the presence of a net position precluded predictability. Petitioners had $ 1,700,585.50 in capital gains in 1980 from other commodity trading. The claimed Lonconex loss of $ 1,753,550.50 canceled out these gains. In 1981, petitioners again had large short-term gains, including $ 493,340.90 from commodity trading (daily settlement) and $ 1,360,000 deferred gain primarily from the 1980 to 1981 Lonconex silver straddles. This resulted in a gain of $ 1,853,340.90. In December 1981, petitioner engaged in two *490 transactions that are relevant here. The first generated Treasury note short-term capital losses of $ 674,621.62 (with gain deferred to 1982), leaving $ 1,178,719.28 in short-term gain. The second, the 1981 Lonconex gold straddles and EFP's, generated net short-term losses of $ 1,367,240 ($ 2,113,400 short-term loss minus $ 746,160 short-term gain) and long-term gains of $ 1,119,240. Thus, the 1981 Lonconex gold straddle/EFP had the effect of converting the remaining short-term gains to long-term gains. In Forseth v. Commissioner, 85 T.C. at 127, 149-152, we found that the correlation of losses to the taxpayer's tax needs was an indication of lack of economic substance. Here, petitioner's losses correlated closely to his tax needs. This further suggests that petitioner's transactions lacked economic substance and profit motive. h. The Use of Artificial Pricing
Petitioner argues that the EFP is a negotiated price, not an artificial price. The parties to an EFP negotiate the price of the exchanged position, the quantity of futures, the cash commodity to be exchanged, and the price of the cash commodity. Thus, the price for each leg of petitioner's *491 EFP's were not required to be executed competitively by open outcry in the trading pit. Petitioner also argues that the differential between the two legs of his EFP reflected commercial realities since at least one leg of the EFP reflected actual market price. On December 10 and 18, 1981, petitioner sold April gold contracts in London at $ 422.60 and $ 431.30 per ounce. On December 21, 1981, petitioner purchased these contracts at the same price, despite the fact that the price of gold had declined. This suggests that there was an artificial price. As a result of the pricing of petitioner's EFP purchase, the gain from the London April gold transaction was eliminated. The effect was to shift gain in a London position to the United States and to obtain the 60-percent long-term capital gain treatment under section 1256(a) (3). The use of artificial pricing contravenes section 1256(a) and (c), which requires the use of fair-market value in determining gain or loss upon the termination of commodity positions, and Smith v. Commissioner, 78 T.C. 350, 381-383 (1982) (Court reviewed), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987). *492 We believe that the use of artificial pricing further suggests that these transactions lacked economic substance. See Glass v. Commissioner, supra at 1159-1160. i. The Volume of Trading
Petitioner claims that the volume and nature of the Comex transactions had nothing to do with whether the trades were bona fide. Petitioner asserts that although Primary simultaneously put up bids for large numbers of buy and sell contracts, it could not have controlled the market and had no way to insure how many other brokers would interfere. In addition, petitioner argues that the fact that all of his trades were posted and cleared by the exchange on the trade day, and verified by the exchange the following day, indicates that the trades actually occurred. Petitioner notes that the trades were never undone. The volume and simultaneous nature of the transactions on Comex effectively guaranteed that few, if any, brokers would interfere. As discussed above, Primary (through Steo) cross-traded in 33 minutes 11,420 April gold contracts. The smallest amount offered and crossed by Steo (400 contracts) was far greater than the largest trade of April gold done by any *493 other broker on December 21, 1991 (60 contracts at 10:24 a.m.). Primary's trades appeared to be done on the market. However, Primary created its own market to avoid risk. Steo cross-traded all 11,420 contracts without having a single contract purchased or sold by another broker in the ring. While Steo was trading April gold for Primary and some of its investors (including petitioner), Rosenthal traded February gold for Primary and its other investors. Although Rosenthal cross-traded 10,963 contracts in 17 minutes, only 13 were picked up by other brokers. Since it was virtually inevitable that the Comex trades would be successfully crossed, there was no real opportunity for outside participation in the transactions. Consequently, the parties were at no real risk that market participation would alter the desired outcome of these transactions. The Comex trading in this case is comparable to that in Katz v. Commissioner, 90 T.C. 1130 (1988). In Katz, the taxpayer was engaged in trading futures contracts in silver coins and gold on the New York Mercantile Exchange (NYMEX). The trading was done in relatively large multicontract lots on futures markets with *494 very limited volume. Despite their size, the trades were made opposite only one other broker at a time. We held that the thinness of the markets and absence of split fills [4] were evidence of wash trading and a lack of economic substance. Katz v. Commissioner, supra at 1140-1141. We find that the transactions entered into in this case were prearranged, noncompetitive, and substantially risk-free transactions. In addition, these transactions constituted wash trades, the essential and identifying characteristic of which is the absence of intent to make a bona fide trading transaction. Sundheimer v. Commodity Futures Trading Commission, 688 F.2d 150, 152 (2d Cir. 1982); Katz v. Commissioner, supra at 1139-1140. *495 We note that our finding is substantially similar to that of both Comex and CFTC (discussed below). We reach this conclusion independent of the Comex and CFTC reports admitted in evidence. j. The Commissions
Petitioner claims that the commissions charged were in all instances usual and proper. Petitioner was not charged a set commission, and his commissions were implausibly low for the amount of trading done. The commissions Lonconex, Ltd., charged petitioner for the London silver and gold transactions were extremely small for silver and nonexistent for gold. The commissions are stated on the difference accounts, and they vary from no commission to 1/16 percent to 1/8 percent on the round turn (commission is charged both on the opening and closing of the position). Typically, a commission of 1/8 percent on the round turn was charged. There was no commission on the London gold transactions, but there was a flat $ 53,000 commission and fees charged on the Comex. The experts indicated that a 1/4 percent charge (1/8 percent on the round turn) for the LME base metals was appropriate. However, Cameron suggested that the fact that the commissions were too low or nonexistent *496 for silver and gold trades on the London Bullion Market was an indication of prearranged trading without economic substance. Selby's explanation that London bullion prices for gold and silver are net of commissions is implausible given that most of the silver transactions showed a 1/16 percent commission charge. We find that the pattern of commission charges here evidences prearranged trading. See Thurner v. Commissioner, T.C. Memo 1990-529. k. Confirmation Slips
Petitioner's confirmation slips and other trading documents were admitted into evidence. Petitioners argue that a presumption of regularity arises from such documents and that this supports the existence of economic substance in the Comex trades at issue. Petitioners cite 9 J. Wigmore, Evidence, sec. 2534, p. 625 (1981), as authority for the presumption of regularity. To the extent any presumption of regularity exists, it is overcome by our finding that the transactions lacked economic substance. 1. Failure of Comex to Take Down the Trades
Petitioners argue that since the trades at issue were not "taken down" by regulatory authorities, they had economic substance and were bona fide. *497 Petitioners' position is that the failure to reverse the trades shows that the trades were bona fide. In Katz v. Commissioner, supra, we found that the NYMEX trades were not bona fide. In Katz, the reviewing authorities (the CFTC) sanctioned the brokers involved in the trades. However, the trades were not reversed. We do not believe that trades must be taken down in order to find a lack of economic substance. 4. The Comex and CFTC Findings
a. The Comex and CFTC Documents
During the trial respondent offered into evidence three groups of Comex and CFTC documents: (1) Findings and investigative reports; (2) documents used by CFTC to support its conclusions and investigative findings; and (3) transcripts of testimony given during the Comex investigation by Steo and Threlkeld. The investigation resulted in findings that PM and M and Lonconex participated in prearranged wash transactions. Petitioners objected on grounds that the proffered evidence was irrelevant, more prejudicial than probative, violative of due process, an improper discussion of ultimate issue, an improper presentation of legal opinions, inadmissible hearsay, and multiple *498 hearsay. They further assert that respondent's expert improperly relied upon the Comex and CFTC reports. The parties agree that petitioners are not bound by the Comex or CFTC findings on grounds of collateral estoppel or res judicata. We agree, and do not apply those concepts here. b. Relevance
Relevant evidence is: evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
Fed. R. Evid. 401. The documents relate to whether the transactions were prearranged, a relevant fact in this case. Accordingly, we believe that the documents are relevant. c. More Prejudicial Than Probative
Rule 403 of the Federal Rules of Evidence provides: Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
We do not believe the probative value of these documents is substantially outweighed by the danger of unfair prejudice, *499 particularly in the context of a bench trial. Gulf States Utilities Co. v. Ecodyne Corp., 635 F.2d 517, 519-520 (5th Cir. 1981). Accordingly, we do not exclude the evidence because it is not more prejudicial than probative. d. Due Process
Petitioners contend that the admission of the Comex and CFTC documents violates due process because they had no notice of the Comex hearings, were not represented by counsel at the investigation and hearings, and had no opportunity to cross-examine and call witnesses or present evidence. The confrontation clause of the Sixth Amendment applies only to criminal prosecutions and may be invoked only by the accused. Hannah v. Larche, 363 U.S. 420, 440 n.16, 4 L. Ed. 2d 1307, 80 S. Ct. 1502 (1960); United States v. Zucker, 161 U.S. 475, 481, 40 L. Ed. 777, 16 S. Ct. 641 (1896); Shapiro v. Commissioner, 73 T.C. 313, 316 (1979). Even in criminal cases the public records exception and other hearsay exceptions have been held not to violate the right of confrontation. E.g., Dutton v. Evans, 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970) (declarations of a coconspirator); United States v. Lee, 589 F.2d 980 (9th Cir. 1979) *500 (certificate that no record exists); United States v. Lipscomb, 435 F.2d 795 (5th Cir. 1970) (business records); United States v. Kelly, 349 F.2d 720 (2d Cir. 1965) (recorded past recollection); Reed v. Beto, 343 F.2d 723 (5th Cir. 1965), affd. 385 U.S. 554, 17 L. Ed. 2d 606, 87 S. Ct. 648 (1967) (public records exception). Reliability may be inferred in a case where the evidence falls within a firmly rooted hearsay exception. Ohio v. Roberts, 448 U.S. 56, 66, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980). As discussed below, we find the Comex and CFTC documents to be reliable and admissible as an exception to the hearsay rule. Accordingly, we hold that there is no due process impediment here. e. Ultimate Issue Discussion
Petitioners contend that the documents are not admissible because they discuss or express opinions as to the ultimate issue of this case. Rule 704(a) of the Federal Rules of Evidence provides: testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.
Accordingly, petitioners' objection lacks merit. f. Hearsay
*501 Petitioners contend that the Comex and CFTC documents are hearsay. The background documents were admitted to show the nature of the Comex and CFTC investigations, and were not admitted to establish the truth of the matters asserted therein. As to the depositions of Steo and Threlkeld, we also consider them only to show the nature of the Comex and CFTC investigation, and not to establish any facts they contain. Such documents are not hearsay. Fed. R. Evid. 801(c); Fowler v. Blue Bell, 737 F.2d 1007, 1013-1014 (11th Cir. 1984). The remainder of the documents at issue are hearsay in that they are statements made out of court offered for the truth of the matter asserted. Respondent argues that three exceptions to the hearsay rule apply: (1) The public reports exception, Fed. R. Evid. 803(8); (2) the business records exception, Fed. R. Evid. 803(6); and (3) the miscellaneous exception, Fed. R. Evid. 803(24). The hearsay arguments will be discussed with the analysis of each category of documents. g. Reliance by Respondent's Expert on Comex and CFTC Findings
Petitioners contend that respondent's expert improperly relied upon the findings and opinions of *502 Comex and CFTC. Rule 703, Fed. R. Evid., provides that an expert may base an opinion on admissible or inadmissible material if it is of a type reasonably relied upon by experts in that field in forming opinions on the subject. Thus, the question for us to decide is whether the Comex and CFTC reports are of a type reasonably relied upon by commodities trading experts. Both experts testified and we found that the Comex findings and conclusions were highly reliable. The Comex investigation was thorough and reliable. We find that the Comex and CFTC reports are of a type on which commodities trading experts reasonably rely. Accordingly, respondent's expert properly relied upon the Comex and CFTC reports. h. The CFTC and Comex Findings and Conclusions
The findings and conclusions of the CFTC and Comex were admitted into evidence under the hearsay exception for public records and reports. Fed. R. Evid. 803(8). Rule 803(8)(C) of the Federal Rules of Evidence provides: The following are not excluded by the hearsay rule, even though the declarant is available as a witness: * * * (8) Public records and reports. Records, reports, statements, or data compilations, in any *503 form, of public offices or agencies, setting forth * * * (C) in civil actions and proceedings * * * factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.
It is not disputed that these are records or reports. The next question is whether Comex is a public agency for purposes of Rule 803(8)(C) of the Federal Rules of Evidence. We conclude that it is. In United States v. Central Gulf, Inc. Lines, 747 F.2d 315, 319 (5th Cir. 1984), a nongovernmental entity arranged for an independent cargo surveyor to examine a cargo and prepare a report. The cargo report was required by Federal regulations and was duly submitted to the Federal agency. The report was held to be an exception to the hearsay rule under Rule 803(8)(C) of the Federal Rules of Evidence.Similarly, in Marsee v. United States Tobacco Co., 639 F. Supp. 466, 470 (W.D. Okla. 1986), affd. 866 F.2d 319 (10th Cir. 1989), an advisory committee report to the Surgeon General was considered to be a public agency report and admissible. Here, Commodity *504 and Security Exchange regulations require Comex to conduct investigations and report to the CFTC. The factual findings and opinions resulted from a Comex investigation which was mandated by law. Accordingly, we hold that the Comex reports are reports of a public agency for purposes of Rule 803(8)(C) of the Federal Rules of Evidence.
We believe that the Comex findings and conclusions are a report pursuant to authority granted by law for purposes of Rule 803(8)(C) of the Federal Rules of Evidence.Comex is required by law to supervise and investigate commodity activities and to report the results to the CFTC. See 17 C.F.R. secs. 8.01 to 8.28, 9.11 (1988). We note that the findings in the subject documents are predominantly factual. To the extent that the subject documents may contain legal findings or conclusions, we disregard them. The last of the five requirements under Rule 803(8)(C) of the Federal Rules of Evidence is that the sources of information or other circumstances not indicate a lack of trustworthiness. The Advisory Committee Notes to Rule 803(8)(C) of the Federal Rules of Evidence state: Factors which may be of assistance in passing upon the admissibility *505 of evaluative reports include: (1) the timeliness of the investigation; (2) the special skill or experience of the official; (3) whether a hearing was held and the level at which conducted; (4) possible motivation problems * * *. Others no doubt could be added. [Citations omitted.]
In this case the findings and conclusions are clearly trustworthy, as shown by the following: (1) The investigation began on the same day the trades occurred. (2) The CFTC and Comex Boards consist of highly knowledgeable experts in the field of commodities. (3) A hearing was held. Witnesses were heard under oath and cross-examined, and the relevant transactional documents were reviewed. Primary was represented by counsel. A full range of procedural protections were afforded to Primary. See 17 C.F.R. secs. 8.01-8.20, 9.20-9.33, 10.101-10.109 (1988). (4) Both experts testified that the Comex findings and conclusions were highly reliable and trustworthy. (5) This whole matter was the subject of a thorough investigation and three levels of review. At every stage the findings that the trading was prearranged, without substantial risk, and resulted in no change in futures or forwards position were *506 sustained. (6) The purpose of the Comex and CFTC investigation was to fairly enforce the rules of the exchange. There is no evidence that the three Comex and CFTC decisions were based on anything other than an impartial review of the evidence and application of the rules of the exchange. In Miller v. New York Produce Exchange, 550 F.2d 762, 769 (2d Cir. 1977), the Second Circuit upheld the admission of a report from the agency forerunner of the CFTC concerning prices and a commodity squeeze. In Smith v. Ithaca Corp., 612 F.2d 215, 220-221 (5th Cir. 1980), and Lloyd v. American Export Lines Inc., 580 F.2d 1179, 1182-1183 (3d. Cir. 1978), Coast Guard accident investigation reports were found to come within Rule 803(8)(C) of the Federal Rules of Evidence. In United States v. School District of Ferndale, 577 F.2d 1339, 1354-1355 (6th Cir. 1978), a Health, Education and Welfare examiner's findings concerning school desegregation were admissible. In Chandler v. Roudebush, 425 U.S. 840, 863 n. 39, 48 L. Ed. 2d 416, 96 S. Ct. 1949 (1976), the Supreme Court stated that Civil Service Commission prior administrative findings *507 with respect to an employment discrimination claim may be admitted as evidence at a Federal sector trial de novo. There are other cases finding agency reports either trustworthy or untrustworthy. In the end, this is a factual question decided according to the circumstances in the particular case. We conclude that here the CFTC or Comex findings are trustworthy. 5. Whether the Transactions Were Entered for Profit
Petitioner argues that his commodity transactions are factually distinct from those in Glass v. Commissioner, supra, and that they were entered into for profit. Petitioner further argues that the London metals trading was an attempt to diversify his investment portfolio and a hedge of his sugar trading on the Coffee, Sugar and Cocoa Exchange. Section 165(c)(1) and (2) limits the deductibility of losses for individuals to those incurred in a trade or business or a transaction entered into for profit. To be deductible under section 165(c)(2), the taxpayer's primary motive must be to make a profit. Ewing v. Commissioner, 91 T.C. 396, 417-418 (1988); Fox v. Commissioner, 82 T.C. 1001, 1021 (1984). *508 The Ewing guidelines are as follows: (1) The ultimate issue is profit motive, not profit potential, although profit potential is considered in determining motive. (2) Profit motive refers to economic profit independent of tax savings. (3) Profit motive is determined with respect to the overall transaction. (4) Profit motive must be primary, or of first importance. Greater weight is given to objective facts as opposed to self-serving statements. (5) The main focus is on the motive at the time the transactions were entered into. However, all circumstances surrounding the transactions are considered in determining profit motive. Ewing v. Commissioner, supra at 418, citing Fox v. Commissioner, supra at 1018-1022. Hedging is taking a position to reduce the risk of price changes of property held by the taxpayer, e.g., by investing in commodities that will gain value if one's other commodities lose value. Sec. 1256(e)(2); Hoover Co. v. Commissioner, 72 T.C. 206, 228-240 (1979). Hedging is a form of insurance against fluctuations in the price of a commodity in which a position has already become fixed, *509 and the sale, liquidation, or use of the commodity is to occur at some time in the future. Muldrow v. Commissioner, 38 T.C. 907, 913 (1962). For a hedge to be bona fide, there must be: (1) A risk of loss by unfavorable changes in the price of something expected to be used or marketed in one's business; (2) a possibility of shifting such risk to someone else, through the purchase or sale of futures contracts; and (3) an intention and attempt to so shift the risk. Muldrow v. Commissioner, supra at 913 n.3; Sicanoff Vegetable Oil Corp. v. Commissioner, 27 T.C. 1056, 1067-1068 (1957), revd. on other issues 251 F.2d 764 (7th Cir. 1958). We find that petitioner was not hedging his daily coffee and sugar trading with Lonconex's London trading. First, the London positions were ordered by Threlkeld, who did not know what petitioner was trading daily and thus did not know which way to hedge. Second, the London positions were sometimes maintained for months and thus were not altered to reflect petitioner's daily fluctuations in position. Since there was no coordination between the London metals trading and *510 petitioner's daily trading, the London trading was not a hedge for the daily trading. Futures trading has not been treated as a part of a taxpayer's trade or business absent a showing that the trading corresponded with risks in the taxpayer's business and thus was a hedge. See Muldrow v. Commissioner, supra at 913 (cotton wholesaler trading cotton futures); Patterson v. Commissioner, T.C. Memo 1981-43 (soybean farmer trading soybeans); Lewis v. Commissioner, T.C. Memo 1980-334 (cattle futures); Hendrich v. Commissioner, T.C. Memo 1980-322 (wheat farmer trading wheat). In this case the evidence establishes that there was no correlation between the alleged hedging and petitioner's trade or business. We earlier discussed factors that show a lack of economic substance and profit motive with respect to petitioner's trading. These factors include lack of business formalities, lack of proper margin, the broker's conflict of interest, petitioner's trading patterns, inadequate commissions, the correlation of tax needs to losses sustained, artificial pricing, the abnormally high volume of trading, and *511 the nature of the trades themselves. Based on these same factors, we conclude that petitioner lacked profit motive in engaging in his commodity transactions. We note, however, that petitioner's losses incurred in his trade or business of being a day trader on the Coffee, Sugar and Cocoa Exchange are deductible under section 165(c)(1). 6. Section 1031
Petitioner argues that his EFP transaction qualifies as a tax-free exchange of like-kind property under section 1031. Alternatively, petitioner argues that the EFP transaction is an exchange subject to the rules of section 1001. Gain or loss must be recognized upon a sale or exchange of property. Sec. 1001(c). However, section 1.1001-1, Income Tax Regs., provides that gain or loss is realized (and thus recognized) on an exchange only when the properties exchanged differ materially in kind or in extent. Whether gain or loss is recognized when a commodities dealer exchanges a London gold contract for a Comex gold contract depends on whether the contracts exchanged differ materially in kind or in extent. Petitioner maintains that no gain or loss should be recognized on his exchange of his London gold contract for a Comex *512 contract which provided the same delivery date (April 1982) and the same quantity of gold. Petitioner cites section 1.1233-1(d)(2)(i), Income Tax Regs., [5] as support for the position that futures contracts purchased on different markets may be considered substantially identical property, and thus are not property differing materially in kind or in extent. The regulation provides that commodity futures purchased through different brokers or on different markets may, depending on the facts and circumstances, be substantially identical property. Petitioner argues that because the London and Comex contracts should be considered substantially identical property, the EFP transaction qualifies for tax-free treatment under section 1031. *513 Respondent argues that section 1031 is inapplicable to transactions lacking in economic substance or profit motive, and exchanges of "choses in action" and other similar intangibles. In addition, respondent asserts that section 1256 (and not section 1031) governs with respect to the recognition of gain on terminated futures contracts. Section 1031 is inapplicable to an exchange of choses in action and certain other intangible contract rights. Sec. 1031(a); [6]R & M Property Co. v. Commissioner, 27 B.T.A. 436, 438 (1932). We have long held that futures contracts are choses in action. Vickers v. Commissioner, 80 T.C. 394 (1983); Covington v. Commissioner, 42 B.T.A. 601, 605 (1940), affd. on this issue 120 F.2d 768 (5th Cir. 1941). *514 7. The Stripped Treasury Notes
Petitioner contends that on December 16 and 18, 1981, he acquired $ 1,300,000 face amount of Treasury notes with coupons for $ 1,416,437.50; stripped the coupons from $ 1,050,000 face value of the notes; sold the stripped note corpus by yearend for $ 529,350.25; and sold the coupons attributable to the stripped notes on January 11, 1982, for $ 689,113.30. Petitioner allocated the entire amount of his basis attributable to the $ 1,105,000 face amount of notes with coupons, in the amount of $ 1,203,971.80 ($ 1,105,000/$ 1,300,000 x $ 1,416,437.50), to the stripped corpus and zero to the coupons. This allocation resulted in a large short-term capital loss in 1981 and a correspondingly large gain (ordinary interest income) in 1982 upon the sale of the coupons. Petitioner maintains that the allocation of basis entirely to the stripped corpus is consistent with Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 2 L. Ed. 2d 743, 78 S. Ct. 691 (1958); Hort v. Commissioner, 313 U.S. 28, 85 L. Ed. 1168, 61 S. Ct. 757 (1941); Helvering v. Horst, 311 U.S. 112, 85 L. Ed. 75, 61 S. Ct. 144 (1940); and Estate of Stranahan v. Commissioner, 472 F.2d 867 (6th Cir. 1973). *515 Petitioner interprets these cases as standing for the proposition that the interest component is not a property right separate from the stripped corpus, and therefore basis cannot be allocated between the corpus and the interest coupons. Respondent contends that petitioner failed to establish that the Treasury note trading actually occurred. Specifically, respondent contends that petitioner did not establish that the coupons were stripped and the corpus sold in 1981. In the alternative, respondent contends that the Treasury note corpus acquisition and sale, if genuine, was not a transaction entered into for profit; and the allocation of all of petitioner's basis to the Treasury note corpus was an improper accounting method that distorted petitioner's income. Sec. 446. Respondent argues that the $ 1,203,971.80 basis should have been allocated to the stripped corpus and coupons in proportion to their fair-market values on the dates acquired. Respondent points to petitioner's acquisition and virtual immediate disposition of the note corpus as evidencing a lack of profit motive with respect to the note corpus and coupons. Notwithstanding petitioner's intention to hold the coupons *516 during all or most of the remaining 5-year term of the notes, respondent contends that petitioner had no profit motive in disposing of the note corpus almost immediately after acquiring it. Respondent objected to the admission of the Lombard-Wall documents as hearsay, but they were admitted as business records of petitioner. Notwithstanding their admission, the documents do not support petitioner's contention that the notes were sold in 1981. Indeed, Exhibit 8-H (the Lombard-Wall monthly statement dated January 29, 1982) shows the sale of the stripped notes on January 11, 1982, and an interest charge from December 31, 1981, through January 11, 1982, of $ 5,588.95, which amount was charged presumably on the full balance of the Treasury notes. Exhibit 11-K, however, shows the December 31, 1981, sale of the stripped note corpus for $ 529,350.25, with a January 11, 1982, settlement date. The internal inconsistencies of these documents, coupled with petitioner's uncorroborated testimony, which we are not required to accept, Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Pascarelli v. Commissioner, 55 T.C. 1082, 1095 (1971), affd. without published *517 opinion 485 F.2d 681 (3d Cir. 1973), are not enough to establish that the notes were stripped and sold in 1981. Petitioners have failed to carry their burden of proving that these transactions occurred in 1981. Further, petitioner did not speak to anyone at Lombard-Wall, but instead entered the transactions through Rosen. There is nothing in the record showing that petitioner either conducted an investigation of Lombard-Wall or sought any interest rate forecasts prior to entering into these transactions. In short, the facts surrounding the purchase, stripping, and sale of the Treasury notes do not support a finding that petitioner engaged in these transactions for profit. In addition, while the transactions do not indicate a profit motive, they bear many indicia of tax-motivated transactions. For example, they were done at yearend and through a tax adviser with no direct involvement by petitioner, involved the holding of positions for brief periods of time, generated a needed short-term capital loss to offset short-term capital gains, and effected a deferral of tax from 1981 to 1982. In view of our finding that petitioner failed to establish that the notes were *518 stripped and sold in 1981, we do not reach respondent's argument regarding the allocation of basis to the stripped corpus and retained coupons in relation to their respective fair-market values. 8. Innocent Spouse Status of Carol Heltzer
Petitioner Carol Heltzer argues that she should be relieved of liability pursuant to the innocent spouse provisions of section 6013(e). Section 6013(e) provides as follows: (e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES. -- (1) In General. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, *519 penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.
Carol Heltzer has the burden of proving that she is entitled to relief under section 6013(e). Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Failure to satisfy any one of these elements would defeat her claim. Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Sonnenborn v. Commissioner, 57 T.C. 373, 381 (1971). a. Joint Return
Petitioners filed a joint return for the years in issue, and thus satisfy the requirement of section 6013(e)(1)(A). b. Grossly Erroneous Items
In view of our holding that petitioner's commodity transactions lacked economic substance, were not entered into for profit, and therefore had no basis in law, we find that the substantial understatements of tax on petitioners' joint returns were attributable to grossly erroneous items of petitioner. Sec. 6013(e)(1)(B). c. Knowledge of the Understatement of Tax
Carol Heltzer must establish that she did not know, or have reason to know, *520 of the substantial understatements of tax. Sec. 6013(e)(1)(C). In light of our holding regarding the requirement of section 6013(e)(1)(D), we need not reach this issue. d. Whether Equitable to Hold Liable
Carol Heltzer must establish that, under all of the facts and circumstances, it is inequitable to hold her liable for the deficiencies attributable to the substantial understatements in tax. Sec. 6013(e)(1)(D). We conclude that Carol Heltzer does not satisfy this requirement. In deciding whether it is inequitable to hold Carol Heltzer liable for the deficiencies, we take into account whether she significantly benefited, either directly or indirectly, from the loss deductions at issue. Belk v. Commissioner, 93 T.C. 434, 440 (1989); Purcell v. Commissioner, 86 T.C. 228 at 242. Normal support is not a "significant benefit" for purposes of determining whether it is inequitable to hold petitioner liable for the deficiency. Sec. 1.6013-5(b), Income Tax Regs.; Flynn v. Commissioner, 93 T.C. 355, 367 (1989); Terzian v. Commissioner, 72 T.C. 1164, 1172 (1979). Normal support is determined by the circumstances *521 of the parties. Sanders v. United States, 509 F.2d 162, 168 (5th Cir. 1975); Flynn v. Commissioner, supra.
Petitioners enjoyed a good financial relationship during the years in issue. Petitioners had a joint bank account and both were authorized signatories on that account. During the years in issue, Carol Heltzer received an allowance of $ 500 a week in 1980 and $ 600 a week in 1981 and 1982 from her husband. She also had charge accounts which she used on a regular basis and paid amounts charged to her accounts by check rather than from her weekly allowance at the end of each month. During the years in issue, Carol Heltzer wrote more than $ 65,000 in checks from petitioners' joint checking account. In 1977 petitioners purchased a home in an affluent community, in which they continue to reside. During the years in issue, petitioners enjoyed a comfortable standard of living. For example, they had housekeepers and they had a family membership at the Middletown Swim and Tennis Club. Carol Heltzer was also a member of the Holmdel Tennis Center. Petitioners built a swimming pool and patio at their home in 1980 through 1982, and had *522 the pool area fully landscaped and enclosed by fencing. Petitioners also had a burglar alarm installed in their home. Petitioners took frequent vacations during the years in issue. Petitioners vacationed in Florida or the Caribbean Islands four to six times each year. In addition, petitioners traveled to London, England, and Carol Heltzer vacationed with friends in Greece. Carol Heltzer made several purchases of art, and employed an interior decorating company to do some work in petitioners' home. Petitioners also purchased several luxury items over the period 1980 through 1982, including jewelry and a fur coat for Carol Heltzer. Carol Heltzer had her dresses made by a dress designer. Petitioner deposited his earnings from commodity trading into their joint bank account. During 1980 through 1982, petitioner used some of his earnings from commodity trading to purchase hundreds of thousands of dollars in certificates of deposit, which increased in value from $ 740,000 in the beginning of 1980 to $ 2,150,000 by the end of 1981. As each certificate of deposit matured, the interest thereon was deposited into petitioners' joint bank account. Carol Heltzer's economic security *523 continued in later years. For example, during 1985 and 1986 petitioners redeemed $ 3.9 million and $ 2.3 million in Treasury bills, and deposited the proceeds into their joint bank account. These Treasury bills were initially purchased with petitioner's prior years' earnings, since petitioner stopped working in 1985. Petitioners' net worth increased dramatically from 1980. As set forth above, petitioners purchased numerous items of expensive personal property and made valuable improvements to their home. This increase in net worth was enhanced by petitioners' utilization of tax shelter devices. Carol Heltzer benefited substantially from petitioners' increase in net worth and the tax savings resulting from the commodity loss deductions. See Nicholas v. Commissioner, 70 T.C. 1057, 1067 (1978). Accordingly, we conclude that it is not inequitable for Carol Heltzer to be jointly liable with petitioner for the tax deficiencies. 9. Negligence
Section 6653(a) provides for an addition to tax if any part of an underpayment is due to negligence or intentional disregard of rules or regulations. Negligence is defined as a lack of due care or failure to do what *524 a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners have the burden of proving that they were not negligent and exercised due care. Freytag v. Commissioner, 89 T.C. at 887; Forseth v. Commissioner, 85 T.C. at 166. Petitioners contend that they are not liable for the addition to tax for negligence because they obtained sufficient tax advice concerning the treatment of petitioner's commodity transactions. We agree that reliance on the advice of professionals may defeat a finding of negligence under certain circumstances. Otis v. Commissioner, 73 T.C. 671, 675 (1980); Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976). Respondent contends that petitioner disregarded the substantive advice of the Cadwalader attorneys as to the treatment of the transactions, and ignored "clear *525 warning signs" with respect to the transactions. The failure to obtain or rely on the independent advice or review of professionals is evidence of negligence. Freytag v. Commissioner, supra at 888-889. Petitioner's accountant, Sager, did not review the alleged commodity and Treasury note losses for validity or accuracy. He merely inserted into the return numbers provided by Rosen, the tax shelter promoter. When a taxpayer relies on experienced professionals, the addition to tax for negligence is generally not imposed. However, in this case petitioner reviewed tax opinions from Cadwalader regarding EFP's and commodity trading which failed to address the economic substance or make any attempt to verify the validity of the commodity trades at issue. Petitioner was an experienced trader in commodities. Given his knowledge and investment experience, there were plainly "sufficient gremlins that would have required a reasonably prudent person to step back and take another look." Freytag v. Commissioner, supra at 887. The failure to adequately investigate the transactions, coupled with such warnings, is evidence of negligence. Freytag v. Commissioner, supra at 887-888. *526 On Schedule B of both the 1980 and 1981 returns, petitioners checked the box indicating that they had no "interest in or a signature or other authority over a * * * securities account or other financial account in a foreign country." The 1980 return showed losses "from commodity trading" of $ 52,958 (petitioner netted his gains from domestic commodity trading of $ 1.7 million and losses from the Lonconex trading of $ 1.75 million), but gave no indication that foreign trading occurred. We find that petitioner's failure to check the "yes" box in response to the foreign account question on Schedule B of his 1980 and 1981 returns was an attempt to obscure the nature of his losses, and is evidence of negligence. See Forseth v. Commissioner, supra at 167-168. In view of our finding that the underlying transactions were not bona fide and lacked economic substance, and in view of the fact that petitioner, an experienced commodities trader, knew or should have known that they were not bona fide, we find that petitioners were negligent and the additions to tax under section 6653(a) apply to them. See Brown v. Commissioner, 85 T.C. 968, 1001 (1985), *527 affd. sub nom. Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1988). 10. Increased Rate of Interest
Section 6621(c) (formerly section 6621(d)) provides for an increased rate of interest where there is a "substantial underpayment" (an underpayment of at least $ 1,000) in any taxable year attributable to tax-motivated transactions. Section 6621(c)(3) defines certain transactions as tax-motivated transactions, including sham or fraudulent transactions and commodity straddles. Sec. 6621(C)(3)(A)(iii), (v); Ewing v. Commissioner, 91 T.C. at 422; Freytag v. Commissioner, 89 T.C. at 887. A tax-motivated transaction consists of any deduction disallowed under section 165(c)(2). See sec. 301.6621-2T, Q&A-4(2), Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984). Petitioner's transactions were tax motivated because they were economic shams, lacked profit motive, and involved straddles. We conclude that the increased interest rate under section 6621(c) applies here for petitioners' 1980 and 1981 taxable years. Decision will be entered under *528 Rule 155. Footnotes
1. Respondent conceded on brief the sec. 6621(c)↩ issue for 1982.
2. A floor broker is allowed to cross a trade on Comex if he first announces the volume and price in the ring and no other broker offers to buy or sell that volume at that price.↩
3. Unless otherwise noted, all references to "section 108" are to section 108↩ of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630, as amended by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2817-2818.
4. A split fill is a multicontract purchase or sale executed in segments of the total purchase or sale quantity, at different times, and often at different prices and with different opposite brokers. See Katz v. Commissioner, 90 T.C. 1130, 1135↩ (1988).
5. Sec. 1.1233-1(d)(2)(i), Income Tax Regs., provides as follows: (d) Other rules for the application of section 1233 -- * * * (2) Commodity futures↩. (i) As provided in section 1233(e)(2)(B), in the case of futures transactions in any commodity on or subject to the rules of a board of trade or commodity exchange, a commodity future requiring delivery in one calendar month shall not be considered as property substantially identical to another commodity future requiring delivery in a different calendar month. * * * Similarly, futures in different commodities which are not generally through custom of the trade used as hedges for each other (such as corn and wheat, for example) are not considered substantially identical property. If commodity futures are otherwise substantially identical property, the mere fact that they were procured through different brokers will not remove them from the scope of the term "substantially identical property." Commodity futures procured on different markets may come within the term "substantially identical property" depending upon the facts and circumstances in the case, with the historical similarity in the price movements in the two markets as the primary factor to be considered.
6. Sec. 1031(a) provides: (a) Nonrecognition of Gain or Loss From Exchanges Solely in Kind. -- No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.↩